**In re PICNIC 'N CHICKEN, INC., a California corporation, Debtor.**

**BLUE BARN ASSOCIATES, a partnership, Plaintiff,**

v.

**PICNIC 'N CHICKEN, INC., a California corporation, Defendant.**

Bankruptcy No. 84–02395–LM11.
Adv. Proc. No. C85–0245–LM11.

United States Bankruptcy Court, S.D. California.

March 17, 1986.

Leo Shaw, San Diego, Cal., for plaintiff.

Charles D. Christopher, San Diego, Cal., for defendant.

## MEMORANDUM DECISION RE: MOTIONS FOR SUMMARY JUDGMENT

LOUISE DECARL MALUGEN, Bankruptcy Judge.

Picnic 'N Chicken, Inc., the debtor and defendant in the complaint by Blue Barn Associates to impress an equitable lien, has moved this Court for summary judgment, contending there is no genuine issue of material fact remaining to be determined, and that the defendant is entitled to judgment as a matter of law. Plaintiff has made a cross-motion for summary judgment.

### FACTUAL SUMMARY

The facts in this action are not in dispute. At the inception of its reorganization case, Picnic 'N Chicken, Inc. ("Picnic") was the operator of 22 fast food outlets. Ten years ago, Picnic negotiated a transaction with Blue Barn Associates ("Blue Barn") in which Blue Barn purchased and leased back to the debtor the buildings and improvements on five of the sites then operated by Picnic. Blue Barn paid $300,000 for the five buildings, allocating the purchase price among the five sites. Picnic retained a ground lease on four of those sites and owned the land in fee for store location No. 2, the subject property.

According to the uncontroverted Declaration of Harvey Lobelson, one of Blue Barn's partners, since Picnic was a relatively new venture, Blue Barn was concerned with protecting its security in the event Picnic did not turn out to be a viable venture. With respect to the four sites on which Picnic held ground leases, in the event of default by Picnic, Blue Barn, as the building lessor, had the right not only to re-enter the buildings and relet them for the account of Picnic, but also the right to compel its lessee, Picnic, to assign the ground lease to Blue Barn for a period of time equal to the term of Blue Barn's building lease.

Since Picnic owned the land in fee on the subject location, a slightly different securi-

ty device was utilized. The building lease between Blue Barn as lessor and Picnic as lessee not only gives Blue Barn the right to re-enter the improvements and relet them for the Picnic's account upon default, but also provides that the lessee must lease its land to the lessor at a fixed rate for a period equal to its original building lease agreement. Specifically, Article 23.H. of the building lease states:

H. That in the event of default by Lessee of any of the terms, conditions, or covenants of this Lease agreement while Lessee is in fee ownership of said underlying land, Lessee does by this Lease agreement agree to rent said underlying [land] to Lessor, at Lessor's option, on a net-net-net basis, for a period commencing at the time of such default and expiring at the date this Lease agreement would have expired had such default not occurred. Upon the date this Lease agreement would have expired Lessor shall have the option to Lease said underlying land an additional five year period. Upon expiration of said five year period, Lessor shall have the option to Lease said underlying land another five year period. Rent during such period or periods shall not exceed $3,600 per year payable monthly in advance on a net-net-net basis.

At a hearing held February 16, 1985, Picnic moved to reject its lease with Blue Barn, citing its belief that once the lease was rejected, it would be able to convey the land free of Blue Barn's lease. Contending that there was a distinction between rejection of the lease and its termination, Blue Barn asked the Court to limit its order to one merely rejecting the lease, reserving the decision as to whether rejection terminated the lease for decision in this adversary complaint "to impress equitable lien." The Court entered an order permitting the debtor to reject the lease and the issue of the effect of that rejection is what remains to be decided by these cross-motions for summary judgment.

## ISSUES

I. Does rejection of a lease by a debtor effect termination of that lease?

II. Should Blue Barn be permitted to enforce the lease provision compelling the debtor to lease to it upon default?

## DISCUSSION

I. *Does Rejection Of A Lease By A Debtor Effect Termination Of That Lease?*

 Accepting all of Blue Barn's factual contentions as true, Picnic contends that once this Court approved its rejection of its lease with Blue Barn, Blue Barn lost all right to enforce remedies it might have had upon default under the rejected lease. Blue Barn contends that a rejection under 11 U.S.C. § 365(g) does not terminate the lease.

Any analysis of the effect of rejecting a lease must necessarily begin with § 365(g), which provides:

Except as provided in subsection (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease.

Therefore, a rejection under § 365(g) is a breach of lease. California law provides that a breach of a lease is not synonymous with the termination of that lease. *See California Safety Center, Inc. v. Jax Car Sales of California, Inc.,* 164 Cal.App.3d 992, 211 Cal.Rptr. 39 (1985). Where a California lease so provides, California Civil Code § 1951.4 permits a lessor to treat the lease as continuing in effect even though its lessee has breached the lease and abandoned the property. Therefore, under California law there is clearly a distinction drawn between a breach of the lease and the termination of it.

Likewise, it appears that the drafters of § 365 were aware of the difference between a "breach" and a "termination." For example, in § 365(h)(1) and (i)(1), although the trustee has a right to reject leases and executory contracts, the lessees, time share interest purchasers and real property purchasers in possession are ac-

corded the option of treating the rejected agreements as terminated or remaining in possession. Therefore, at least with respect to those sections, it is clear that the drafters were aware that a rejection of a lease or executory contract did not result necessarily in the termination of that agreement.

Although there is a paucity of cases dealing with the issue of the effect of the debtor's rejection of an unexpired lease, it appears that the better-reasoned decisions hold that rejection by the debtor does not necessarily terminate a lease agreement for all purposes. *In the Matter of Garfinkle,* 577 F.2d 901 (5th Cir.1978) the Court of Appeals considered the unusual situation of a rejection of a 999-year lease in which the landlord and the tenant were the same person. Permitting the so-called "split-personality" trustee to reject the lease would have had the effect of terminating a third party mortgagee's interest in leasehold. The Court of Appeals held that rejection of the lease did not by itself terminate the lease, but merely had the effect of removing the lease from the estate. Although the Court's decision was one construing the effect of rejection under § 70(b) of the Bankruptcy Act [11 U.S.C. § 110(b), now repealed], it does not appear that the Court's analysis would have been significantly different under the present § 365.

The two cases under the Bankruptcy Code which have addressed the effect of rejection under § 365(g) have reached opposite conclusions. *In re Hawaii Dimensions, Inc.,* 47 B.R. 425 (D.C.Hawaii 1985) considered the rejection by the debtor/lessee of commercial space and the leasehold mortgagee's contention that a rejection did not terminate the lease. The district court, relying upon the language of 11 U.S.C. § 502(b)(6) referring to "damages resulting

from the termination of a lease of real property", determined that the rejection of the lease operated to terminate it.[1]

In attempting to reconcile the opposite conclusions of *Matter of Garfinkle* and *Hawaii Dimensions,* the Bankruptcy Court in *In re Storage Technology Corp.,* Bankr.L.Rep. (CCH) Para. 70,757 p. 87,738 stated:

> ... [T]he apparently conflicting cases regarding the effect of rejection of a lease can be reconciled with one word: equity. In both *Matter of Garfinkle* and *Hawaii Dimensions,* the potential for inequitable results appears to have a large impact on the ultimate result reached. At p. 87,-740.

After a thorough analysis of the language of § 365 and § 502(b)(6), Bankruptcy Judge Gueck determined that § 502(b)(6) should not be interpreted as determining the legal effect of a rejection under § 365(g) but merely was a limitation on the amount of claim which could be asserted by a lessor damaged by rejection of a lease. The court in *In re Storage Technology, Corp.* agreed with the holding in *Matter of Garfinkle* that rejection of a lease does not have the conclusive effect of terminating it. It is this line of decision which this Court finds persuasive and adopts in this case.

## II. *Does Blue Barn Have The Right To Impress An Equitable Lien, Or Are Its Damages Limited By § 502(b)(6)?*

Having concluded that a rejection of the lease did not terminate it, the Court must address the contention of Picnic that the landlord's remedies are limited to filing a claim for damages as limited by 11 U.S.C. § 502(b)(6) and an equitable lien may not be impressed upon the debtor's property post-

---

1. 11 U.S.C. § 502(b)(6) provides:

 If such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, [the court shall allow such claim in such amount, except to the extent that] such claim exceeds—
 (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the

 remaining term of such lease, following the earlier of—
 (i) the date of the filing of the petition; and
 (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
 (B) any unpaid rent due under such lease without acceleration, on the earlier of such dates;

petition. As a corollary to this position is Picnic's contention that to give Blue Barn an equitable lien would result in circumvention of the damage limitation Congress sought to impose on landlords' claims by adopting that section.

### A. *Nature Of The Lease Agreement:*

■ Before this Court can determine whether Blue Barn's damages should be limited by § 502(b)(6), the Court must determine exactly what was the nature of the lease agreement between Blue Barn and Picnic. The Declaration of Harvey Lobelson states that the lease with Blue Barn was a financing transaction. The Lobelson declaration is not controverted. Counsel for Picnic asserts merely by way of argument that when Picnic sought to reject its lease with Blue Barn, it did so on the assumption that it was dealing with a real property lease and not a financing lease and that the Court's ruling permitting rejection of the lease so held. The transcript of the hearing on the motion to reject the lease and, indeed, the written order do not support that contention. Accordingly, the only evidence before the Court is that this lease was a financing transaction.

Further, an examination of the economic substance of the lease between Blue Barn and Picnic supports the conclusion that this was a disguised financing arrangement. In the case of *In re Nite Lite Inns,* 13 B.R. 900 (Bankr.S.D.Cal.1981), my colleague, Judge James W. Meyers, examined a similar sale/leaseback arrangement between Nite Lite Inns, the lessee/seller, and Burke Investors, the lessor/buyer. In concluding that the leaseback arrangement was merely a financing arrangement, he observed:

> For all practical purposes, Nite Lite was the "owner" of the motel property despite the transaction.

> First, the parties expressly referred to the Lease Agreement as a "net-net-net" lease. This meant that the "lessee-seller", Nite Lite, was responsible for payment of all real estate taxes, the procurement of fire and liability insurance and the undertaking of repairs and mainte-

nance of the motel property, at no cost to Burke Investors [citations omitted].... Third, Nite Lite was to pay all utility costs associated with the motel property. Fourth, Nite Lite was granted a broad right to alter or modify the motel property after notice had been given to Burke Investors. Fifth, Nite Lite was to keep the motel property free and clear of all mechanics liens and was to indemnify Burke Investors as to all liability resulting from violations of applicable laws, or, from personal injury or property damage liability.

> With respect to the question of "rentals" it is clear that the "rent" charged under the Lease agreement did not simply reflect fair compensation for the use of the motel property. It was designed to amortize Burke Investors' costs in purchasing the motel property and also to provide a rate of return on that investment. This becomes apparent when the amount expended by Burke Investors ... is compared with the projected return under the minimum and percentage rental provisions in the Lease Agreement. At. p. 909.

The identical factors relied upon by Judge Meyers are present in this transaction. First, the lease is a "net-net-net" lease. Second, Picnic is obligated to pay all utility costs (Article 15 of the Lease). Third, Picnic has been granted broad rights to alter or modify the property (Article 8). Fourth, Picnic is to keep the property free and clear of all mechanics liens and indemnify Blue Barn as to all liability resulting from violations of applicable laws or from personal injury or property damage liability (Article 8, Article 18). Finally, it is clear that the total of the reserved rent plus the percentage rent is designed to return to Blue Barn the pro-rata amount of its original loan of $60,000 plus a rate of return on that investment. Therefore, considering the Lobelson Declaration together with the foregoing analysis of the lease terms, the Court concludes that the lease with Blue Barn was a financing transaction.

B. *Are Damages For Breach Of Financing Leases Limited By 11 U.S.C. § 502(b)(6)?*

■ Blue Barn contends that the legislative history to 11 U.S.C. § 502(b)(6) limits the application of the section to true leases and not financing leases of real property or leases intended as security. The full text of the Senate Judiciary Comments concerning the distinction states:

As used in section 502(b)(7)[2] the phrase "lease of real property" applies only to a "true" or "bona fide" lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security. Historically, the limitation on allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Partly for this reason, claims of a lessor of real estate were not provable prior to the 1934 amendments to the Bankruptcy Act. Second, in a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease. Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor.

However, these considerations are not present in "lease financing" transactions where, in substance, the "lease" involves a sale of the real estate and the rental payments are in substance the payment of principal and interest on a secured loan or sale. In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing "leases" are in substance installment sales or loans. The lessors are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law.

Whether a "lease" is true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease." The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property. S.Rep. No. 95–989, 95th Cong., 2d Sess. 64 (1978).

In the face of this legislative history, the treatise *Collier On Bankruptcy* concluded that:

In short, it seems beyond question that section 502(b)(6) applies to claims of landlords arising from the termination of true leases of real property and not from lease financing transactions when, in substance, the "lease" involves merely a sale of the real estate and the rental payments in reality are payments of principal and interest on a secured loan involving a sale of real estate. King, 3 *Collier On Bankruptcy*, Para.502.02, pp. 502–63, 502–64.

---

**2.** Section 502(b)(7), referred to in the quotation, was redesignated as section 502(b)(6) in the

Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353.

*In re Storage Technology Corp.* supports this view in stating:

> The general unsecured claim for damages resulting from termination of the lease is only one component of a lessor's damages. (citations omitted) The lessor may also have administrative priority claims for occupancy of the premises after the filing of the petition. (citations omitted) The word "termination" in section 502(b)(6) merely limits the scope of this subsection and leaves unaffected the claims of a lessor from damages not arising from termination. (citations omitted) *In re Storage Technology Corp., supra,* at p. 87,741.

Therefore, § 502(b)(6) is not a limitation on the damages which may be claimed by Blue Barn since the Court has concluded that Blue Barn had a financing lease with Picnic and not a true lease.

### C. *Entitlement To "Equitable Lien."*

██ Finally, the Court must address whether Blue Barn is entitled to enforce the lease's provisions compelling the debtor to lease to Blue Barn. Picnic contends that even if Blue Barn's arrangement was a financing lease, it failed to properly perfect its security interest prior to the filing of the debtor's Chapter 11 petition and should be left merely to its pre-petition unsecured claim as the holder of an unperfected security interest.

The question then is whether Blue Barn properly perfected its interest in the debtor's real property for purposes of enforcing Article 23 of the lease. In examining the record, it appears that Blue Barn attempted to give notice of the provisions of the lease in two ways. Contemporaneous with the closing of the transaction in September 1975, Blue Barn recorded a deed of trust which stated it secured the obligations of Picnic under the lease, and it also recorded a Memorandum of Lease stating that Blue Barn had leased to Picnic under the terms and conditions set forth in the lease agreement.

Sometime in 1978, the debtor, through its then sole shareholder, Atlas Hotels, Inc., requested full reconveyance of the deed of trust. When Blue Barn requested assurance that its security interest would not be jeopardized, Atlas responded:

> This is to advise you that the recorded memorandum of lease between Picnic 'N Chicken, Inc. and Blue Barn Assoc. at the referenced location will give the subject lease priority over any trust deeds when the existing 2nd Trust deed in favor of Blue Barn Assoc., a partnership, and recorded September 15, 1975, is reconveyed. [Letter of Donald B. Gravette, Mgr., Real Estate Development, Atlas Hotels, to Blue Barn Associates, c/o Harvey Lobelson dated January 12, 1978].

Relying on that assurance, Blue Barn reconveyed its deed of trust on Picnic's land. However, the Memorandum of Lease remained of record. It gave enquiry notice to all parties seeking to determine what claims, if any, might be made against Picnic's fee title to the subject property. No further or additional notice need have been given of the rights of Blue Barn.

Although counsel for Blue Barn has somewhat inartfully phrased his complaint as one to impress an equitable lien, the substance of the complaint is that Blue Barn be permitted to compel the debtor to lease its land to Blue Barn at the rates set forth in Article 23 of the lease and be given possession of the buildings (which it owns) so that Blue Barn may operate a business or relet the premises and possibly recoup its investment over the balance of the reserved lease term. Enforcement of these provisions is not the impressment of an equitable lien, but rather the enforcement of the provisions of its security device—a compulsory lease effective upon default.

In principle, a compulsory lease of property effective upon default is not different from a compulsory conveyance of fee title to property upon default, which is the effect of foreclosing a mortgage. If compelling the lease of the land to Blue Barn for the stipulated rent would have the effect of depriving Picnic of the fair value of the property, this Court should not strictly enforce the compulsory lease. Rather, it should fashion an equitable remedy ade-

quately protecting Blue Barn's interest in being repaid the money it advanced plus the agreed return under its financing lease. The Court does not have sufficient information concerning the amount which Blue Barn is claiming and the fair value of the property to determine whether Blue Barn is entitled to have the relief it requests; or, whether, like a secured creditor having a claim less than the fair value of the property, it is entitled merely to adequate protection of its interest.

## CONCLUSIONS

1. The debtor's rejection of its lease under 11 U.S.C. § 365(g) did not terminate the lease.

2. The sale/leaseback arrangement was merely a financing transaction.

3. The damage claim for breach of financing leases is not limited by 11 U.S.C. § 502(b)(6).

4. Blue Barn's entitlement to enforce its compulsory lease can only be determined after the parties adduce evidence as to the amount of Blue Barn's claim and the value of the subject property.

This Memorandum of Opinion shall constitute findings of fact and conclusions of law as required by Bankruptcy Rule 7052. Counsel for Blue Barn shall submit an order in accordance with this Opinion within ten (10) days of its entry.