United States Court of Appeals,

Fifth Circuit.

No. 93-7127.

In the Matter of AUSTIN DEVELOPMENT COMPANY, Debtor.

EASTOVER BANK FOR SAVINGS, Appellant,

v.

SOWASHEE VENTURE, et al., Appellees,

v.

AUSTIN DEVELOPMENT COMPANY and J.C. Bell, Trustee, Appellees.

May 3, 1994.

Appeal from the United States District Court for the Southern District of Mississippi.

Before HIGGINBOTHAM, DAVIS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The debtor was a lessee under a ground lease and sublessor of a movie theater it built; it assigned its interest in the ground lease and the theater's income stream to a bank as security for various loans. During its Chapter 11 proceeding, the debtor's inaction led to an automatic rejection of its ground lease. 11 U.S.C. § 365(d)(4).[1] The district court and bankruptcy court held that the "deemed rejection" of the lease effected the termination of the bank's rights under the ground lease and the bank's assignment of the theater sublease.[2] We reverse and remand.

BACKGROUND

The facts in this case are straightforward. Austin Development Company (Austin) entered

[1] 11 U.S.C. § 365(d)(4) reads:

> [I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

[2] The theater obtained a nondisturbance agreement with Sowashee, and its lease remained in place notwithstanding Austin's Chapter 11 proceeding. We do not need to consider the impact of § 365(d)(4) on the theater's sublease from the debtor.

into a long-term ground lease from the predecessor of Sowashee Venture, a general partnership (Sowashee). After borrowing funds from another bank and building a motion picture theater on the property, Austin subleased the property to the predecessor of R & S Theaters, Inc. (R & S), the theater's current operator. Austin borrowed money from Eastover Bank for Savings (Eastover) to pay off its first lender and for other purposes in 1986. As security for the Eastover loans, Austin granted Eastover a deed of trust on its tenant-leasehold interest in the ground lease from Sowashee and an assignment of Austin's interest in the sublease to R & S. Before Austin's bankruptcy, R & S paid about $11,085 in monthly rental and taxes directly to Eastover. Eastover then applied about $9,000 of this sublease payment to Austin's debt, paid Sowashee about $1,500 as monthly rent under the ground lease, and escrowed money for ad valorem taxes.

On January 2, 1991 Austin filed for reorganization under Chapter 11. Austin did not assume the Sowashee ground lease within 60 days after it filed its bankruptcy petition, nor did Eastover file a motion to compel Austin to assume or reject. Sowashee thereupon filed a motion and complaint requesting that the bankruptcy court terminate 1) Austin's interest as lessee in the ground lease, 2) Eastover's deed of trust on Austin's leasehold interest, and 3) Eastover's interest in the sublease with R & S. Eastover's counterclaim asked the bankruptcy court to order Sowashee to enter into a ground lease with Eastover, as provided for under paragraph 21 of the ground lease. That lengthy "paragraph" granted Austin permission to mortgage all or part of its leasehold estate and granted any future leasehold mortgagee numerous rights as a third-party beneficiary of the ground lease. These creditor rights, similar to those found in nondisturbance agreements between landlords and leasehold mortgagees, included: 1) a requirement that the parties to the ground lease obtain the leasehold mortgagee's written consent prior to cancellation, surrender, or modification of the ground lease; 2) the right to cure lessee's defaults; 3) the right, if termination were to be declared by the landlord, to nullify the termination or indefinitely postpone it by curing all conditions of default; and 4) the right, if termination were to be realized, of the leasehold mortgagee to enter into a new lease with the landlord on the same terms as the terminated lease.

The bankruptcy court found for Sowashee and against Eastover in all respects. It ruled that

§ 365(d)(4) of the Bankruptcy Code did not result in a breach, but rather a termination of the ground lease, the termination of Eastover's interest in the sublease payments, and the termination of Eastover's rights under the ground lease as a third-party beneficiary. The district court affirmed.

DISCUSSION

The question presented in this case is what it means when a debtor as a lessee of nonresidential real property fails within 60 days after filing a Chapter 11 case to assume an unexpired lease. Under § 365(d)(4) of the Bankruptcy Code, the lease is "deemed rejected." Does the rejection terminate the lease and thus extinguish a security interest taken in the debtor's interest in the lease, a sublease by the debtor-lessee, or similar rights that accrued by and among third parties?

This question, although arising infrequently, has generated starkly conflicting opinions among the bankruptcy courts.[3] The bankruptcy and district courts here relied upon the line of cases that construe rejection under § 365(d)(4) essentially as an avoiding power against such holders of security interests in the debtor's leases.[4] Those cases deduce that when a lease is "deemed rejected," the further requirement of § 365(d)(4) that the trustee "shall immediately surrender such nonresidential real property to the lessor" effects a termination of the lease. Under these cases, the lease is terminated by operation of federal law and not because of any breach of its terms. They conclude that when the lease terminates, security interests in the lease are extinguished. *See In re Giles Associates, Ltd.,* 92 B.R. 695 (Bankr.W.D.Tex.1988). Somewhat inconsistently, these courts also state that if the lienholders had come into court within the 60-day period for assumption or rejection of

---

[3]*Compare In re Gillis,* 92 B.R. 461 (Bankr.D.Haw.1988); *In re Giles Assocs. Ltd,* 92 B.R. 695 (Bankr.W.D.Tex.1988); *Chatlos Sys., Inc. v. Kaplan,* 147 B.R. 96 (D.Del.1992), *aff'd without opinion,* 998 F.2d 1005 (3d Cir.1993) (having no precedential value, however, under Internal Operating Procedures of the Third Circuit, IOP 5.6, *reprinted at* 28 U.S.C.A. Rules, Part 1 (West Supp.1993)); *In re Hawaii Dimensions, Inc.,* 39 B.R. 606 (Bankr.D.Haw.1984), *aff'd* 47 B.R. 425 (D.Haw.1985) *with In re Storage Technology Corp.,* 53 B.R. 471 (Bankr.D.Colo.1985); *In re Picnic 'N Chicken, Inc.,* 58 B.R. 523 (Bankr.S.D.Cal.1986); *Societe Nationale Algerienne Pour la Recherche v. Distrigas Corp.,* 80 B.R. 606, 608-09 (D.Mass.1987); *In re Blackburn,* 88 B.R. 273, 276 (Bankr.S.D.Cal.1988). *See generally* William E. Winfield, *Rejection of Nonresidential Leases of Real Property in Bankruptcy: What Happens to the Mortgagee's Security Interest?,* 17 Pepp.L.Rev. 429 (1990).

[4]*See, e.g., In re Gillis; In re Giles Assocs., Ltd.; In re Hawaii Dimensions, Inc.,; Chatlos Sys., Inc. v. Kaplan*—all cited *supra* note 3.

nonresidential real property leases, they could have avoided the dire consequence of "deemed rejection." Precisely how the lienholders, such as Eastover, could have protected themselves is not explained and is highly problematic.[5] These opinions circularly conclude that the statutory breach plus surrender provided in § 365(d)(4) must cause a termination of the trustee's or debtor-in-possession's rights in the leasehold, because otherwise, "the face of the statute and its history are meaningless."[6] *In re Giles,* 92 B.R. at 698.

Flawed by their failure to analyze § 365(d)(4) in harmony with the rest of § 365 and applicable statutory antecedents, these opinions have worked needless and perhaps unconstitutional forfeitures of security interests. This court's interpretation relies instead on those cases that have construed the plain meaning of § 365, understood in light of all its terms, which together express the Congressional purpose behind the trustee's assumption and rejection power.[7] *Toibb v. Radloff,* 501 U.S. 157, ----, 111 S.Ct. 2197, 2199-2200, 115 L.Ed.2d 145 (1991). Section 365 derives from § 70(b) of the former Bankruptcy Act, a provision that broadly codified the common law doctrine that allowed the trustee either to assume and perform the debtor's leases or executory contracts or to "reject" them if they were economically burdensome to the estate. *See generally* Michael T. Andrew, *Executory Contracts in Bankruptcy; Understanding "Rejection,"* 59 U of Colo.L.Rev. 845, 874-81 and n. 136 (1988). This court has held that the deemed rejection of a lease under § 70(b) did not terminate the

---

[5]If the debtor had the unfettered right to assume or reject within 60 days, it is hard to see how the leasehold mortgagee could, by moving within that period to compel the debtor to act, assure itself of protection. One court held that the mortgagee's protection lies in a § 554 motion to compel the trustee (or debtor-in-possession) to abandon the leasehold, which would leave all parties to fight out their relationships in the state court. *In re Bernard,* 69 B.R. 13 (Bankr.D.Haw.1986). This prescription seems unnecessarily contrived as compared with our straightforward reading of § 365(d)(4).

[6]Contrary to the statement in *Giles* and similar ones by other courts, legislative history provides very little guidance for the interpretation of the effect of § 365(d)(4) on mortgagees of a debtor's leasehold. It is true that § 365(d)(4) is part of the 1984 "shopping center" amendments to the Bankruptcy Code and that it sought to lessen the vacancy period for lessors to debtors in such cases by requiring a firm 60-day assume/reject decision. *See In re Giles,* 92 B.R. at 697. This goal of protecting lessors does not conflict with the protection of leasehold mortgagee's rights, however, because a mortgagee would have to comply with the lease in order to take it over from the debtor. The lessor would have to be satisfied.

[7]*See, e.g., Societe Nationale Algerienne Pour la Recherche v. Distrigas Corp.; In re Storage Technology Corp.; In re Picnic 'N Chicken*—all cited *supra* note 3.

lease but merely placed the trustee's obligation to perform under the leasehold outside of the bankruptcy administration without destroying the leasehold estate. *In re Garfinkle,* 577 F.2d 901, 904 (5th Cir.1978). Consequently, on facts similar to those in the instant case, *Garfinkle* held that the mortgage of the original lessee from whom the bankrupt acquired the leasehold was preserved notwithstanding an attempted rejection. *Id. Garfinkle*'s analysis remains persuasive, as § 70(b) and § 365(d)(4) do not materially differ in the way they effectuate the assumption and rejection power. *See In re Storage Technology Corp.,* 53 B.R. 471, 474 (Bankr.D.Colo.1985); Andrew, *supra,* 59 U.Colo.L.Rev. at 879 and nn. 136-140.

Turning to § 365, the terms rejection, breach and termination are used differently, but not inconsistently or interchangeably, as some courts have suggested. *See, e.g., In re Giles,* 92 B.R. at 698. Throughout § 365, rejection refers to the debtor's decision *not to assume* a burdensome lease or executory contract. Section 365(g) states that rejection of a lease "constitutes a breach" except as provided in subsections (h)(2) and (i)(2). Three circuits, including this one, have held that this language does not mean that the executory contract or lease has been terminated, but only that a breach has been deemed to occur. *In re Continental Airlines,* 981 F.2d 1450, 1459 (5th Cir.1993) ("to assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached"); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir.1990); *Leasing Service Corp. v. First Tennessee Bank, Nat'l Ass'n,* 826 F.2d 434, 436-37 (6th Cir.1987).[8] Consistent with this interpretation, § 502(g) permits the creditor on a rejected lease or executory contract to assert a claim for damages as of the date of bankruptcy, although under §

---

[8]In *Wainer v. A.J. Equities, Ltd.,* 984 F.2d 679, 684 (5th Cir.1993), this court opined that under § 365, a debtor-tenant "can reject the lease, which is then terminated...." That statement is immaterial to the court's discussion and holding in *Wainer,* is inconsistent with *Matter of Continental Airlines, supra,* and *Matter of Garfinkle, supra,* and has no precedential effect. Likewise, in *Sea Harvest Corp. v. Riviera Land Co.,* 868 F.2d 1077, 1080-81 (9th Cir.1989), the court stated that, "Surrender of property, whether its use is for a retail store in a mall or a clam harvesting operation in the tidelands, has the effect of terminating the enterprise that operates there." The court did *not* say, as is sometimes suggested, that the effect of § 365(d)(4) was to terminate the lease, but only the "enterprise" if the debtor is the lessee.

502(b)(6) a landlord's claim may be subject to a cap.[9] Rejection is treated as a breach to preserve the rights of the party whose lease with the debtor has been rejected by providing a prepetition claim; if rejection were deemed a complete, immediate termination, it is not clear what the measure of the creditor's claim would be.

The decision to reject is thus not correctly viewed as a "power to breach" the executory contract or lease. As one commentator put it,

> [w]hat the estate's representative is rejecting is the contract or lease *asset,* which conceivably could carry continuing obligations with it into the estate on an administrative basis. Rejection simply prevents the *estate* from unadvisedly stepping into such liabilities. The liabilities are not repudiated; to the contrary, as the rejection-as-breach doctrine is designed to insure, the contract or lease liabilities remain intact after rejection and give the non-debtor party a claim in the distribution of the estate.

Andrew, *supra* at 883 (footnote omitted).

Further, Congress knew how to authorize the termination of executory contracts and leases in § 365. "Termination" is used in § 365(h), (i), and (n) as one option available respectively to the purchaser of an interest in a timeshare project, the vendee of real property, or the licensee from the debtor of a right to intellectual property *if* the trustee has rejected the executory contract. Accordingly, the trustee may reject any of these contracts, but termination does not occur except at the other party's option. The option to terminate a timeshare lease, § 365(h)(1), or a license, § 365(n)(1)(A), arises where the trustee's rejection "amounts to such a breach as would entitle the [party] to treat such lease or [contract] as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements...." 11 U.S.C. § 365(h)(1) and § 365(n)(1). In § 365(h)(1), rejection is used synonymously with "disaffirmance" for these purposes; in none of these subsections

[9]A particularly thoughtful bankruptcy court opinion recently concluded that under 11 U.S.C. § 502(b)(6), all of a landlord's damages arising from the rejection of the debtor's lease, including those based on a covenant to repair, are capped by that provision. *In re Mr. Gatti's, Inc.,* 162 B.R. 1004 (Bankr.W.D.Tex.1994). The landlord argued that the cap plainly encompassed only "damages resulting from the termination ...," § 506(b)(2), a phrase that appears to exclude "consequential" damages. The bankruptcy court, rejecting the landlord's argument, first adopted the decisions cited *supra* n. 4, which equate rejection with termination. Alternatively, it pointed out that even if those decisions are not followed, the landlord's claim is one "against the estate" in bankruptcy based on the debtor's breach. The precise scope of § 502(b)(6) is not before this court; while our reasoning does not agree with the first rationale asserted in *Mr. Gatti's,* the second rationale might easily be reconciled to this case.

is rejection or disaffirmance equated with termination. Under an objective reading, the provisions of § 365 may be redundant and complex, but Congress was not confused in its differing usages of the terms rejection, breach and termination.

It is also worth pointing out, as several courts have done, that breach and termination of leases or executory contracts are not synonymous terms under state law. *See e.g., In re Storage Technology, supra;  In re Picnic 'N Chicken, Inc.,* 58 B.R. 523, 525 (Bankr.S.D.Cal.1986) (California law); *Resolution Trust Corp. v. Cramer,* 6 F.3d 1102, 1108 (5th Cir.1993) (describing options available to landlords under Texas law). Congress could have chosen to depart from the state law meanings of these terms, but taken as a whole, § 365 suggests that it did not do so.

The cases that equate rejection with lease termination under § 365(d)(4) ultimately rest on a manufactured definition of termination as "breach plus surrender of the premises." Thus, the breach caused by the trustee's failure to assume or reject the lease within 60 days is "so serious" that § 365(d)(4) requires the debtor to surrender the leased premises immediately, and the breach plus surrender "can only be seen" as a termination of the trustee's rights. *In re Giles,* 92 B.R. at 698. Contrary to this line of reasoning, the word "termination" does not appear in § 365(d)(4). Moreover, that a lease is "deemed rejected" in § 365(d)(4) cannot uniquely cause it to be "terminated," when no such consequence follows a "deemed rejection" in § 365(d)(1), and termination precedes a "deemed rejection" under the terms of § 365(d)(5) (providing that an air carrier's lease of an aircraft terminal or gate may be "deemed rejected" five days *after* the occurrence of a "termination event"). Section 365 offers no textual support for equating "breach plus surrender" with "termination;"  to the contrary, it furnishes good reasons for deducing that Congress did not collapse breach or rejection into the termination of a lease or executory contract.

If, notwithstanding the foregoing discussion, a § 365(d)(4) deemed rejection of a lease or executory contract automatically brings about its termination, it is peculiar that the most adverse consequences of that statutory interpretation are reserved not for the lessor or lessee—either of which may be the party opposite the debtor—but for the third-party mortgagee whose rights have been held forfeited by operation of law. This result has no policy rationale within the scope of § 365's

adjustment of rights between the parties to the lease. Moreover, it is a capricious result that makes no bankruptcy sense. While the Bankruptcy Code expressly authorizes avoidance of certain liens and other preferential rights against the debtor, *see, e.g.,* 11 U.S.C. §§ 544, 547 and 548, the avoidance power read into § 365 is, uncharacteristically, an implied authority. *See* Andrew, *supra,* 59 U.Colo.L.Rev. at 901-02. Moreover, the trustee's avoidance powers may ordinarily be exercised only by means of an adversary proceeding, with its attendant procedural protections, whereas the § 365(d)(4) "forfeitures" of security interests have occurred automatically, by operation of law, without procedural protections. Finally, in eliminating the rights of a mortgagee of the debtor-lessee's interest in a lease, the policies justifying avoidance—to enhance the pot of unencumbered assets available to creditors and to discourage a race to the courthouse before bankruptcy—have not been served. The only rights affected by this implied avoidance power are outside of the bankruptcy court's realm because after rejection, the debtor's estate is no longer involved in the leasehold transaction. This extraordinary implied power does not reduce claims against the debtor's estate; if anything, it increases the unsecured claims by the amount of the mortgagee's claim in the "terminated" lease.

For these reasons, we conclude that a debtor's inaction in timely deciding to assume or reject a lease of nonresidential real property under § 365(d)(4), which leads to a deemed rejection, does not effect a termination of that lease, or, consequently, an implied forfeiture of the rights of third parties to the lease.

As applied to the case at hand, § 365(d)(4) stipulates that when Austin failed timely to assume or reject its lease from Sowashee, the lease was breached and Austin was required to surrender the premises. Sowashee became entitled to file a proof of claim based on a "breach" effective immediately before Austin's bankruptcy. 11 U.S.C. § 502(g). Sowashee was also entitled to receive rent from the filing of bankruptcy to the date of lease rejection. 11 U.S.C. § 365(d)(3).

Because the lease did not terminate upon its deemed rejection, Eastover retained rights in it against Sowashee as a third-party beneficiary of ¶ 21 of the Austin-Sowashee lease. The extent of Eastover's rights, an issue not adjudicated below, should be decided in state court, because after rejection the debtor's estate had no remaining interest in the outcome of that controversy, which is

not "related to" the bankruptcy as is required for federal jurisdiction.  28 U.S.C. § 1334(b).

## CONCLUSION

The judgments of the district and bankruptcy courts are REVERSED and the case is REMANDED for further proceedings consistent herewith.