In re Neil G. BERGT; Alaska International Properties, Inc., an Alaska corporation; Viewpoint Ventures Partnership; Alaska International Industries, Inc.; and Alaska Diversified Properties, Inc., Debtors.

Bankruptcy Nos. A95–00334–HAR, A95–00820–HAR, A96–00344–HAR, A96–00345–HAR, A96–00346–HAR.

United States Bankruptcy Court, D. Alaska.

Oct. 22, 1999.

Ronald W. Goss, Shulkin Hutton, Seattle, WA, for Debtors.

Jeffrey P. Stark, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Anchorage, AK, for Wood River Ltd.

Patrick J. McCabe, Owens & Turner, Anchorage, AK, for GCI.

Diane F. Vallentine, Jermain, Dunnagan & Owens, Anchorage, AK, for All Acquisitions.

**MEMORANDUM DECISION DENYING REJECTION OF WOOD RIVER, LTD.'S RIGHT OF FIRST REFUSAL BECAUSE IT IS NOT EXECUTORY AND § 365(a) IS NOT AN AVOIDING POWER**

HERBERT A. ROSS, Bankruptcy Judge.

## Contents

| | | Page |
|---|---|---|
| 1. | INTRODUCTION | 18–19 |
| 2. | FACTUAL AND PROCEDURAL BACKGROUND | 18–19 |
| 3. | ISSUES | 19 |
| 4. | ANALYSIS | 19 |
| 4.1. | Ninth Circuit Case Law Establishes That the Right of First Refusal is Not an Executory Contract When There Was No Sale Pending at the Time of Bankruptcy | 19 |
| 4.2. | Rejection of a Right of First Refusal on Property of the Estate Does Not Result in "Avoiding" the Property Interest of the Nondebtor Holder of the Right | 20–21 |
| 4.2.1. | Law Review Articles by Michael Andrew and Jay Westbrook | 21 |
| 4.2.2. | The Basics and Some Case Law Regarding Rejection of Executory Contracts Applying the Andrew–Westbrook Analysis | 24–25 |
| 4.2.3. | Ninth Circuit Case Law Does Not Foreclose the Andrew–Westbrook Approach and Some Supports It | 27–28 |
| 4.2.4. | Secondary Authority Generally Adopts the Andrew–Westbrook Approach | 33 |
| 5. | CONCLUSION | 36 |

1. *INTRODUCTION*—Debtors want to sell several lots, acquired prepetition subject to a right of first refusal (RFR) in favor of adjoining lot owners. They moved to reject the RFR as an executory contract,[1] and impliedly avoid the RFR.

An adjoining lot owner opposed on the grounds that the RFR is not an executory contract subject to rejection. Should the court approve the rejection of the RFR?

Under the controlling case law, the RFR is not an executory contract subject to rejection. More importantly, rejection is not an avoiding power.

2. *FACTUAL AND PROCEDURAL BACKGROUND*—These are jointly administered chapter 11 cases. The debtors

---

1. 11 U.S.C. § 365(a).

have an approved disclosure statement and are seeking confirmation. They propose a liquidating plan involving the sale of a number of physical assets, mostly real property scattered around Alaska, to a local telecommunication company, GCI.

Included as part of the package are lots which were acquired before bankruptcy by debtor Alaska International Industries, Inc. (AIII), subject to an RFR in favor of other lot owners in the subdivision. Under the RFR, AIII must offer the lots it wants to sell to the other lot holders in the subdivision on the same terms offered to a third party purchaser so the other lot owners can preempt the sale for their own benefit.

Wood River, Ltd. is owner of lots in the subdivision, and claims the right to exercise an RFR to match the offer AIII has to sell the lots to GCI. AIII disputes that the RFR still exists on various grounds (including abandonment, unclean hands, waiver, or the fact that it is part of a package deal), but this *Memorandum* only concerns the pure bankruptcy issue of whether the RFR is an executory contract which can be rejected under 11 U.S.C. § 365(a).

The debtors argue that rejection of the contract will benefit the estate by facilitating the package sale to GCI, which may be in jeopardy if the lots are not included. Implicit in debtors' motion is the assumption that, upon approval of the rejection, Wood River, Ltd.'s RFR will evaporate and it will become an unsecured creditor of the bankruptcy estate. Parenthetically, the unsecured creditors of AIII will receive only a very small percentage of their claims under the proposed plan.

Wood River, Ltd. defends on the ground that the RFR is not an executory contract.

At oral argument, the court questioned whether rejection was, in fact, an avoiding power, and if the question of whether the RFR was an executory contract was of any consequence.

3. *ISSUES*—The issues are: (a) is the RFR an executory contract subject to rejection, and if so, (b) does rejection of the RFR result in avoiding its enforcement by the nondebtor holder of the RFR?

4. *ANALYSIS*—

■ 4.1. *Ninth Circuit Case Law Establishes That the Right of First Refusal is Not an Executory Contract When There Was No Sale Pending at the Time of Bankruptcy*—The 9th Circuit has recently held that an option agreement, at least one that is not in the process of being exercised at the time the bankruptcy is filed, is not an executory contract.[2] This was in the *en banc* decision in the *Robert L. Helms Construction* case, which overturned a prior 9th Circuit decision holding that an option agreement was *per se* an executory contract.[3]

The court adhered to the "Countryman" test in defining an executory contract. It set out the Countryman test of whether a contract was executory as follows:

> ... a contract is executory if "the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." [citation omitted][4]

**2.** *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v. Southmark Corporation (In re Robert L. Helms Construction & Development Co., Inc.)*, 139 F.3d 702 (9th Cir.1998).

**3.** *Gill v. Easebe Enterprises (In re Easebe Enterprises)*, 900 F.2d 1417, 1419 (9th Cir.1990).

**4.** *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v. Southmark Corporation (In re Robert L. Helms Construction & Development Co., Inc.)*, 139 F.3d at 705; *see*, Vern Countryman, *Executory Contracts in Bankruptcy (Part 1)*, 57 Minn. L. Rev. 439, 460 (1973) [Countryman I].

The *en banc* panel concluded that if an option was not in the process of being exercised at the time of the bankruptcy, it was not an executory contract. On the other hand, one of the situations in which an option might be executory is if it had been exercised, but closing had not taken place when the bankruptcy was filed.[5]

The question is whether the RFR in the present proceeding has attributes sufficiently similar to the option in the *Robert L. Helms Construction* case so that the *Helms* decision controls the treatment of the RFR. Although AIII argues that there are distinctions, I conclude that an option to sell real property and an RFR with respect to real property are so close in concept that, notwithstanding their differences, an RFR would be determined to be or not to be an executory contract under the same test as enunciated in the *Helms* case. That is, if there was not a sale pending when the bankruptcies were filed, the RFR is not an "executory contract."

An RFR is defined in Black's Law Dictionary as:

> Right to meet terms of proposed contract before it is executed; e.g. right to have first opportunity to purchase real estate when such becomes available, or right to meet any other offer. *The holder of such a right has the option to purchase* the grantor's real estate on the terms and conditions of sale contained in a bona fide offer by a third party to purchase such real estate, provided it is an offer that the grantor is otherwise willing to accept. See also Option. [italics added]

■ The holder of an RFR cannot compel a sale, but has a preemptive right to buy when the owner decides to sell.[6] It is sometime characterized as a "conditional option"[7] or as a "preemptive option."[8]

*Helms*, without discussing the difference between an option and an RFR, cited a BAP opinion, *Coordinated Financial Planning Corporation*,[9] a case involving an RFR as if it were authority on the option issue. In *Coordinated Financial*, the BAP held that an RFR was an executory contract, apparently assuming that a rejection by the trustee would avoid the estate's need to comply with the RFR. *Coordinated Financial* has been impliedly overruled on that point by *Helms*.

So, the easy answer to the debtors' motion to reject is that the RFR on AIII's lots is not an executory contract and not subject to rejection since it was not being "exercised" when the bankruptcy petitions were filed. But, the easy answer does not resolve the underlying issue—what is the effect of the rejection?

There seems to be little equity or logic in the *Helms* distinction about whether an option is executory or not, if the distinction governs the rights that flow from rejection. If rights are lost due to being connected to an exercised "executory" contract, this leads to a quixotic result. An option which is closer to being performed by having been exercised is "executory," and the rights are lost upon rejection, but one that has not been exercised (i.e., where the performance is not as advanced) can retain the rights. The *Helms* decision would lead to the following result:

5. *Id.* at 706.

6. *See, e.g., Campbell v. Alger*, 71 Cal.App.4th 200, 83 Cal.Rptr.2d 696, 699 (2nd Dist.1999); *Beder v. Cleveland Browns, Inc.*, 129 Ohio App.3d 188, 717 N.E.2d 716, 721 (8th Dist. 1998); *Velarde v. United States*, 992 F.Supp. 1235, 1243 (D.Colo.1998).

7. *Miller v. LeSea Broadcasting, Inc.*, 914 F.Supp. 290, 295 (E.D.Wis.1996), *rev. on other grounds*, 87 F.3d 224 (7th Cir.1996).

8. *Hare v. McClellan*, 234 Conn. 581, 662 A.2d 1242, 1247 (1995).

9. *Steffan v. McMillan (In re Coordinated Financial Planning Corp.)*, 65 B.R. 711, 713 (9th Cir. BAP 1986).

(a) an option contract which is not exercised at the time the bankruptcy petition is filed, but is exercised the following day, is not executory—so the nondebtor's rights are not subject to § 365(a) rejection, and the nondebtor *can* enforce its rights in the property; but,

(b) if the option is exercised the day before bankruptcy, the nondebtor *can not* enforce its rights in the property if the option is rejected (or, at least that is the unstated premises of the ruling in *Helms* ).

In bankruptcy, rights often depend on whether a creditor falls on one side or another of an arbitrary time line, as in the case of preferences.[10] However, there is no statutory or common law justification for such a draconian result with respect to property rights created by contract merely because they involve contracts which are "executory." This is the subject of Part 4.2 of this *Memorandum.*

■ **4.2.** *Rejection of a Right of First Refusal on Property of the Estate Does Not Result in "Avoiding" the Property Interest of the Nondebtor Holder of the Right*—AIII's motion to reject the RFR under § 365(a) presumes that the RFR will be avoided by the rejection. And, the presumption of "avoidance upon rejection" of the option in the *Helms* case was an unstated conclusion of the opinion, or why else would it have been so concerned if the option was executory?

The trend of the law is, however, that rights created by state law in a specific asset (for example, the right of a nondebtor optionee to purchase land) are not avoidable by rejection under 11 U.S.C. § 365(a) alone.

**4.2.1.** *Law Review Articles by Michael Andrew and Jay Westbrook*—The reason for this trend arose in academia. About a decade ago, three law review articles, two by Professor Michael T. Andrew [11] and one by Professor Jay Lawrence Westbrook,[12] provided rays of sunlight in the murky and confused area of the bankruptcy law involving executory contracts.

The law review articles are so well written and researched that their conclusions have been increasing adopted by bankruptcy courts (and, more recently by district and appellate courts) to resolve issues involving assumption and rejection of executory contracts. These cases will be discussed in Part 4.2.2 of this *Memorandum,* and the status of the issue in the 9th Circuit will be discussed in Part 4.2.3.

Though the law review articles are secondary legal authority, they are well documented with case law and legislative history, explaining where the courts have gotten off track, and showing the proper analytical path. Most professionals who dabble in bankruptcy and have tried to make sense of § 365 will come away with the feeling of "that's it!"

Although their conceptual approaches to § 365 vary, Westbrook and Andrew reach virtually identical conclusions as to the appropriate way to resolve most of the important issues regarding the interpretation or legal analysis under § 365. Regarding the consequences of "rejection," Andrew wrote:

> . . . Westbrook and I agree on essentially all of the important practical consequences of rejection. Departing from the view of many of the cases, for example, we agree that rejection does not cancel, repudiate, or terminate con-

10. 11 U.S.C. § 547(b)(4).

11. Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection,'* 59 U. Colo. L. Rev. 845 (1988) [Andrew I] and Michael T. Andrew, *Executory Contracts Revisit-*

ed: *A Reply to Professor Westbrook,* 62 U. Colo. L. Rev. 1 (1991) [Andrew II].

12. Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn. L. Rev. 227 (1989) [Westbrook].

tracts; that no preliminary test of the "executoriness" of a contract is necessary as a precondition to its rejection; and that rejection does not, like bankruptcy law's "avoiding powers," terminate state-law rights in or to specific property. By contrast, our points of disagreement relate largely to the conceptual and historical underpinnings of section 365 and to the appropriateness of a test for assumability of contracts. [footnote omitted] [13]

To summarize Andrew's and Westbrook's key points:

- The assumption of an executory contract has the effect of making the debtors' obligations an administrative expense of the estate. [14]

- "Rejection" is merely the trustee's business judgment that the estate should not assume the burden of an executory contract as an administrative expense. Thus, the nondebtor party has an unsecured claim for such nonperformance instead of an administrative expense claim. It is often not advisable for a trustee or debtor-in-possession to assume and obligate itself to pay the obligation in regular U.S. dollars as opposed to rejecting and turning the claim into an unsecured claim payable in what are usually attenuated "bankruptcy dollars" (i.e., paying 10¢ on the $1.00 is probably above average in most chapter 7 cases). [15]

- Where the nondebtor party has property rights or contractual rights in property of the estate which are the subject

of the executory contract, the decision by the trustee not to assume (i.e., to reject) *does not* cancel or repudiate the nondebtor's rights. [16] That is, the nondebtor's rights in the property are not terminated by the rejection under § 365(a) alone, and they will persist if they would persist under state law.

Many earlier decisions missed the distinction that rejection did not terminate the property rights of the nondebtor. [17] How did the law get turned on its head with respect to this "rejection avoiding power" misconception? Andrew thinks it is largely the unfortunate prodigy of a 1956 district court case, *In re New York Investors Mutual Group, Inc.* [18] which he has analyzed extensively. [19]

The debtor in *New York Investors* had a pre-bankruptcy contract to sell real property. A down payment was made and closing was to occur later. The contract was recorded, which gave the vendor a lien for recovery of the down payment. New York Investors filed bankruptcy and the bankruptcy trustee did not assume the contract, which was automatically rejected under § 70(b) of the Bankruptcy Act within sixty days. The trustee, in fact, approved the rejection of the contract.

The court indicated that, since a *debtor-vendee* could reject the obligations under a lease, a trustee of a *debtor-vendor* (such as New York Investors) ought to be able to do the same, reasoning what's good-for-the-goose is good-for-the-gander. [20] This unthinkingly imposes a symmetry in treatment of nondebtor vendors or vendees

**13.** Andrew II at 2.

**14.** Andrew I at 884; Westbrook at 232; 3 *Collier on Bankruptcy*, ¶ 365.09[1] (15th ed. rev. 1999).

**15.** Westbrook at 232, 252–53; Andrew I at 884–89; *see, also, Medical Malpractice Ins. Assn. v. Hirsch*, 114 F.3d 379, 386–87 (2nd Cir.1997); 3 *Collier on Bankruptcy*, ¶ 365.09[1] (15th ed. rev. 1999).

**16.** Andrew I at 901–31; Westbrook at 269–70.

**17.** *See*, cases cited in Andrew I at 884–89, 901–921; Westbrook at 295–315.

**18.** *In re New York Investors Mutual Group, Inc.*, 143 F.Supp. 51 (S.D.N.Y.1956).

**19.** Andrew I at 906–12.

**20.** *In re New York Investors Mutual Group, Inc.*, 143 F.Supp. at 54.

upon rejection. A different treatment is called for, depending on whether the non-debtor is the vendor or the vendee, because of the disparate rights involved.

Andrew summarizes the district court's faulty logic as follows: [21]

> Remarkably, the court in New York Investors showed no real awareness that it was creating, essentially without precedent, a new title-clearing doctrine. It seemed to view its conclusion as following naturally from the assume-or-reject election, which, the court said, existed 'to achieve the overriding purpose of the bankruptcy law to secure an equitable distribution of the assets of the bankrupt.'
>
> ... the court's characterization of the purpose of the assume-or-rejection election was correct in two respects. First, the election is designed to assure that a party to a pending contract or lease is not elevated fortuitously to administrative priority merely by virtue of the estate's succession to the debtor's property (the Copeland concept [22]). Second, reciprocally, rejection-as-breach doctrine is designed to assure that such a party is not demoted fortuitously to non-creditor status merely by virtue of incomplete performance of the contract (the Chicago Auditorium concept [23]). Those concepts recognize that a party to a pending contract is fundamentally no different from other claimants, and thus should not receive different treatment merely as a consequence of the contract's 'executoriness.'
>
> But the court in New York Investors ignored the fact that bankruptcy law's treatment of claimants other than parties to 'executory' contracts distinguishes among them based upon their differing rights in or to property of the debtor, as in the recognition of security interests. Indeed, bankruptcy law recognizes third parties' equitable interests in property, including interests the essence of which is the right to obtain the specific property. Thus, to say that executory contracts doctrine is designed to yield an 'equitable distribution' does not lead to the conclusion that rights in and to property held by a party to an executory contract should be terminated. To the contrary: terminating such rights inverts the policy of executory contracts doctrine by demoting property claimants to general creditors merely by virtue of the fortuity that their rights arose under a contract that happened to be 'executory' when bankruptcy intervened. [footnotes omitted]

Andrew preemptively refutes most of the arguments which could be made for an "avoiding-power rejection theory." He lists five of them: [24]

● *The 'Property–Rights–v.–Contract–Rights' Argument* which states that property rights are protected, but contract rights are not. Andrew argues that this is too narrow a view of rights created by state law.[25]

● *The 'No–Specific–Performance' Argument* which holds the purpose of rejection is to insulate the estate from the obligation of performing contracts. Andrew said this is partially true—rejection protects the estate from the financial obligation of affirmatively performing the debtor's obligations—but, this does not mean that the nondebtor's property rights in estate property should be cut off, and if necessary, enforcement of thus rights may be by specific performance.[26]

---

21. Andrew I at 907–09.

22. *Copeland v. Stephens,* 106 Eng. Rep. 218 (KB 1818); *and, see,* Andrew I at 856–66, and fn. 80.

23. *Central Trust Co. v. Chicago Auditorium Ass'n,* 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811 (1916).

24. Andrew I at 919–931.

25. Andrew I at 922–24.

26. Andrew I at 924–26.

● *The 'Claims–and–Discharge' Argument* confuses the *debtor's* right to a discharge from a *claim* of a nondebtor with the nondebtor's rights against property of the *estate*.[27] For example, whether a covenant not to compete by a debtor can be enforced does not depend on whether the contract is executory or rejected, but whether it is a claim which can be discharged against the debtor. The estate is not involved.

● *The 'Negative Inference' Argument,* holding that, since § 365 provides in several instances for the protection of nondebtor's property rights when contracts are rejected (e.g., the rights of lessee's,[28] real estate vendee's or timeshare purchasers,[29] licensees of intellectual property[30]), by negative inference, where such rights are not specifically mentioned they are subject to cancellation. Andrew argues that this is too much of a leap, and that it can just as well be inferred that Congress has provided specific protections only when the courts have reached such inequitable results effecting nondebtor's property rights that legislative direction is applied *ad hoc* to the problem.

● *The 'Goal–of–Rehabilitation' Argument* holding that cancellation of nondebtor's rights in property is necessary to further the rehabilitation goal in bankruptcy.[31] Andrew points out the rejection does not only apply to the reorganization chapters in which the debtor's rehabilitation is contemplated, but also to chapter 7 liquidation cases. In the latter, releasing the estate from presumptively burdensome nondebtor

rights in the estate's property serves no such goal. More importantly, nondebtor's rights are protected in other situations—e.g., secured creditors' rights trump the equality of distribution policy.

In discussing the disruptive effect of unnecessarily delving in the psychedelic[32] world of executory contracts, Michael Andrew said:

Executory contracts doctrine has been confounded by persistent confusion over the term 'rejection.' ... that term has often irresistibly—and incorrectly—suggested to modern courts that the point of the doctrine is the repudiation or cancellation of contract liabilities. One result has been countless cases in which courts have, when presented with a request to reject, conducted elaborate inquiries into the 'executoriness' of a contract, often apparently unaware that the result should be the same whether the contract is 'executory' or not because it is the asset, not the liability, which is rejected.[33]

Consider, for example, the recent 9th Circuit's *Robert L. Helms Construction*[34] case discussed in Part 4.1 of the *Memorandum.* Resolution of *Helms* required a substantial expenditure of judicial resources (including a three-judge BAP panel, a three-judge 9th Circuit panel, and an eleven-judge *en banc* panel) to decide whether an option was "executory." Whether or not the option was executory was, however, superfluous. The real issue was whether or not rejection of the option somehow abrogated the optionee's rights.

27. Andrew I at 926–28.

28. 11 U.S.C. § 365(h)(1)(A)(ii).

29. 11 U.S.C. § 365(i)(2)(A)(ii).

30. 11 U.S.C. § 365(n)(1)(B); Andrew I at 928–29, fn. 291, referring to fn. 261–263.

31. Andrew I at 929–31.

32. Westbrook at 228.

33. Andrew I at 901.

34. *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v. Southmark Corporation (In re Robert L. Helms Construction & Development Co., Inc.),* 139 F.3d 702 (9th Cir.1998).

If the option agreement in *Helms* was subject to some other specific avoiding power under 11 U.S.C. §§ 544, 547, 548, it could have been addressed under the rules governing them.[35] The executory contract inquiry obscured that issue.

The following Part 4.2.2 discusses how, I believe, "rejection" should be analyzed and discusses some cases which have adopted the Andrew–Westbrook analysis.

4.2.2. *The Basics and Some Case Law Regarding Rejection of Executory Contracts Applying the Andrew–Westbrook Analysis*—Section 365(a) provides that a trustee (including a debtor-in-possession)[36], with court approval, can assume or reject any executory contract or unexpired lease of a debtor.[37] There is no definition of the term "executory contract" in the Bankruptcy Code.[38]

 A rejection of an executory contract or unexpired lease of a debtor by a trustee constitutes a breach of the contract or lease by the estate.[39] If the contract or lease has not previously been assumed in the bankruptcy case, rejection of it is treated as if the contract or lease had been breached immediately before the case was filed.[40] An executory contract or lease is *not* terminated by the rejection under the emerging view.[41]

The effect of the trustee's rejection is to relegate the damages from such breach to the status of an *unsecured claim.* A rejection is merely the trustee's election by an affirmative motion or by the passage of time in some cases (a "deemed" rejection[42]) that the estate not assume the obligation of the debtor as an *administrative expense.*[43] Thus, in the case of the proverbial 10 on-the-$1.00 dividend in a liquidation case, the trustee pays a $1.00 claim based on a rejected executory contract with a 10¢ dividend on the *unsecured claim.*

 On the other hand, if a contract or lease is assumed with the bankruptcy court's permission, the obligation of the debtor which is assumed becomes an *administrative expense* of the estate, as opposed to an unsecured claim [44] which ranks lower in the priority of distribution.[45] The trustee must pay $1.00 on the $1.00, or 100% for the assumed executory contract or lease.[46] So, rejection will allow the trustee to maximize the recovery for all the unsecured creditors in the appropriate case, rather than favoring the one whose contract must be paid in full if assumed, unless there is economic benefit to the estate for assuming.

The application of these principles is easy in a simple case—e.g., one in which the debtor has agreed to purchase goods at a set price, and seller has not delivered or the buyer paid. The trustee normally rejects the executory contract if the assumption will not benefit the estate, such as a case where the debtor agreed to pay too much, or there is no profit to be derived from assumption. On the other hand, if the debtor had a sweetheart

35. *See,* discussion in Westbrook at 311–15.

36. 11 U.S.C. § 1107.

37. 3 *Collier on Bankruptcy,* ¶ 365.03 (15th ed. rev. 1999).

38. *Id.* at ¶ 365.02[1].

39. 11 U.S.C. § 365(g).

40. 11 U.S.C. § 365(g)(1).

41. 3 *Collier on Bankruptcy,* ¶ 365.09[3] (15th ed. rev. 1999).

42. *See, e.g.,* 3 *Collier on Bankruptcy,* ¶ 365.04[3][a].

43. *Id.* at ¶ 365.09[1].

44. *Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.),* 78 F.3d 18, 30 (2nd Cir.1996).

45. 11 U.S.C. § 726(a),(b).

46. These examples are adapted from Westbrook at 252–55, 263–70.

deal—e.g., a deal to purchase an item worth $100,000 for $10,000—the trustee normally would assume and acquire the valuable asset for a song.

But, as the facts become more complicated (such as where a nondebtor has rights in the property), the case law becomes murkier. What if the debtor owned land and gave an option to purchase to the nondebtor? The option has been exercised on the date of the petition so it is executory under the 9th Circuit law per *Helms.* The trustee thinks he can sell the land for more. Can the trustee back out of performance, i.e., avoid honoring the option which was exercised by the nondebtor pre-petition? This is the crux of the issue in our case.

Many courts have struggled with such problems, and the decisions are confused by focusing on the "executoriness" of the contract or lease instead of the underlying state law property or contract rights.[47] This confused the issue and often led to bizarre results.

Some courts concluded that "rejection" meant that the contract was terminated, repudiated or canceled, including the rights of a nondebtor who was not in actual breach in specific assets. For example, in the highly criticized *Lubrizol*[48] case, the 4th Circuit held that the rights of a licensee of a debtor's technology could be terminated because the license agreement was deemed to be an executory contract.

The debtor had licensed intellectual property rights to the nondebtor, Lubrizol. After a bankruptcy was filed, the trustee thought he could sell the rights to third parties and get more money. The court struggled with the question of whether the contract was executory (and, thus subject to rejection), and found it was based on some minimal requirements by the debtor licensor to keep the nondebtor licensee advised about the use of the technology and to defend against any potential infringement. Instead of viewing rejection as merely releasing the debtor from affirmative performances under the licensing agreement, the court also found that rejection terminated the agreement, an incorrect result per Andrew[49] and Westbrook.[50]

Congress, also, thought the result was incorrect. Bad decisions like *Lubrizol* have inspired Congress to remedy the specific situation with special legislation, such as in the intellectual property area.[51] Westbrook and Andrew argue for a more universal resolution. They contend that the law, as it exists, can be interpreted to resolve a *Lubrizol*-type problem by understanding that rejection of an executory contract does not repudiate the rights of the nondebtor in specific assets of the estate if those rights are granted by state or federal law.

A number of courts have adopted the Andrew–Westbrook conclusion that rejection of an executory contract does not repudiate or cancel the rights of a nondebtor in property of the estate.

The 5th Circuit in *Matter of Austin Development Co.,*[52] in an opinion authored by Judge Edith H. Jones, a member of the former National Bankruptcy Review Commission, held that a debtor's deemed rejection of its rights as a lessee could not be used as an avoiding power to bar a bank which had a security interest in debtor's

47. *See,* Westbrook at 257–63.

48. *Lubrizol Enterprises Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043 (4th Cir.1985), cert. den., 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

49. Andrew I at 916–19.

50. Westbrook at 305–15.

51. *See,* 11 U.S.C. § 365(n); Andrew at 919; Westbrook at 306–7.

52. *Sowashee Venture v. Austin Development Co. (Matter of Austin Development Co.),* 19 F.3d 1077 (5th Cir.1994).

leasehold from curing debtor's default, thus preserving for itself the value of the leasehold rights.

The lessor argued that the deemed rejection canceled the lease; including the bank's right to cure. The court dismissed this argument citing Andrew and a number of courts [53] that have reached the conclusion that rejection of a lease or executory contract does not terminate the lease or contract, but acts only as the trustee's disaffirmance of the lease (i.e., refusing to accept the debtor's obligations as an administrative expense), without destroying other parties' rights under the lease or contract.

Judge Jones criticized some decisions by courts in the 9th Circuit which have held that "rejection" is equivalent to "termination." [54] I will discuss these in Part 4.2.3 of this *Memorandum*.

And, the 2nd Circuit followed suit in *In re Lavigne*,[55] holding a debtor-in-possession's rejection of a medical malpractice insurance policy did not bar a subsequent chapter 7 trustee's acquisition of the tail-end insurance (covering claims first asserted after the period covered by the insurance). The insurance company had argued that rejection of the policy terminated the right to acquire the tail-end insurance. The court held that rejection merely freed the trustee from performance, but did not make the contract disappear. The court, applying New York law, determined in the case of malpractice insurance that the contract could be canceled without destroying the right of the policy holder to acquire the tail-end insurance, so that right could be accorded the trustee also.

The bankruptcy court in the *Drexel Burnham* case, adopting the Westbrook analyses, held that the rights to escrowed securities held to insure payment of part of a key executive's compensation package were not abrogated by rejection of the employment contract by the chapter 11 trustee.[56] While the court rejected the Countryman approach,[57] an option not available to me in light of the 9th Circuit case law,[58] the same conclusion can be reached even under the Countryman test. I will discuss this further in Part 4.2.3 of this *Memorandum* in the discussion about 9th Circuit precedent.

In *In re Couture*,[59] a district court in Vermont held that rejection of a nonresidential lease did not terminate the lease. If the debtor had rights which subsisted under state law, the rejection of the lease did not necessarily abrogate a possessory interest which might exist under state law.

Finally, from the 9th Circuit, a few cases have concluded that rejection of an executory contract does not terminate the state

53. *In re Storage Technology Corp.*, 53 B.R. 471 (Bankr.D.Colo.1985); *Blue Barn Associates v. Picnic 'N Chicken, Inc. (In re Picnic 'N Chicken, Inc.)*, 58 B.R. 523 (Bankr.S.D.Cal.1986); *Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp. (In re Societe Nationale Algerienne Pour La Recherche, La Production, Le Transport, La Transformation et La Commercialisation des Hydrocarbures)*, 80 B.R. 606, 608–09 (D.Mass.1987); *Blackburn v. Security Pacific Credit Corporation (In re Blackburn)*, 88 B.R. 273, 276 (Bankr.S.D.Cal. 1988).

54. *In re Gillis*, 92 B.R. 461 (Bankr.D.Haw. 1988); *In re Hawaii Dimensions, Inc.*, 39 B.R. 606 (Bankr.D.Haw.1984), *aff'd*, 47 B.R. 425 (D.Haw.1985).

55. *Medical Malpractice Ins. Assn. v. Hirsch*, 114 F.3d 379, 386–87 (2nd Cir.1997).

56. *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 700–711 (Bankr.S.D.N.Y.1992).

57. *Id.* at 708.

58. *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v. Southmark Corporation (In re Robert L. Helms Construction & Development Co., Inc.)*, 139 F.3d at 705.

59. *Couture v. Burlington Housing Authority (In re Couture)*, 225 B.R. 58, 63–64 (D.Vt. 1998).

law rights of a nondebtor in estate property. These are discussed in Part 4.2.3.

### 4.2.3. *Ninth Circuit Case Law Does Not Foreclose the Andrew–Westbrook Approach and Some Supports It—*

*INTRODUCTION*—There is nothing in the 9th Circuit case authority that prevents this court from adopting the view that the nondebtor's rights (the RFR) of Wood River, Ltd. are not terminated even if the RFR was an executory contract and rejected by AIII, the debtor.

There are a few cases from the 9th Circuit favorable to the conclusion I reach in Part 4.2.2 of this *Memorandum*. Most of the seemingly contrary authority is readily distinguished.

The most troublesome case is one making a cursory blanket statement in a footnote, that a rejected contract to sell land by a debtor-vendor cannot be specifically enforced. That is contained in an enigmatic footnote in *In re Kaonohi Ohana, Ltd.*,[60] which I will discuss at the end of this Part 4.2.3.

*CASES HOLDING REJECTION ARE NOT AN AVOIDING POWER*—The most recent case which is in agreement with the view that § 365(a) is not an avoiding power is *In re Locke*,[61] a bankruptcy court decision from the Central District of California. Judge Zurzolo found that a nonresidential lease and a tenancy-in-common agreement were executory contracts, which were deemed rejected under § 365(d)(1). There was a judgment lien against the debtor who was a co-tenant. The co-tenants tried to take advantage of the deemed rejection by claiming the rejection terminated the lease and tenancy agreement, leaving nothing to which the judgment lien could attach.

The court rejected this argument. After reviewing some of the 9th Circuit precedents (some of which will be discussed in this *Memorandum*, also), the court[62] relied heavily on the Andrew–Westbrook analysis and the *Austin Development*[63] case from the 5th Circuit to conclude that rejection under § 365(d)(1), (4) did not terminate the lease or executory contract, and that the judgment lien was not impaired by the rejection alone.[64]

Bankruptcy Judge Louise Adler of the Southern District of California authored several opinions, both before the Andrew–Westbrook articles, holding that rejection of an executory contract or lease does terminate the lease, but only the debtor-lessee's obligation to perform the affirmative tasks.

In the first of Judge Adler's cases, *In re Picnic 'N Chicken*,[65] Blue Barn Associates provided the debtor with restaurant buildings on sites which were either owned by the debtor or held as lessee under long-term ground leases. The buildings were leased to the debtor by Blue Barn, and to secure its position in the building leases, Blue Barn took a contingent reassignment of the ground leases exercisable on default. In this way, Blue Barn would have the right to use the location on which its leased buildings were constructed in the event of debtor's default on the building leases.

Picnic 'N Chicken filed chapter 11 and moved to reject the building leases, con-

**60.** *Kaonohi Ohana, Ltd. v. Sutherland (In re Kaonohi Ohana, Ltd.)*, 873 F.2d 1302, 1306, fn. 5 (9th Cir.1989).

**61.** *CASC Corp. v. Milner (In re Locke)*, 180 B.R. 245 (Bankr.C.D.Cal.1995).

**62.** Discussed in Part 4.2.2 of this *Memorandum*.

**63.** *Sowashee Venture v. Austin Development Co. (Matter of Austin Development Co.)*, 19 F.3d 1077 (5th Cir.1994).

**64.** *CASC Corp. v. Milner (In re Locke)*, 180 B.R. at 257–63.

**65.** *Blue Barn Associates v. Picnic 'N Chicken, Inc. (In re Picnic 'N Chicken, Inc.)*, 58 B.R. 523 (Bankr.S.D.Cal.1986).

tending that this would terminate the building leases, including the assignment of the ground leases. Blue Barn countered that the rejection of the building leases did not terminate the building leases, but only the debtor's obligation to perform. It contended that, under California law, the rejection of a lease was not a termination of the lease. The court adopted Blue Barn's argument.

Judge Adler was not persuaded by *In re Hawaii Dimensions, Inc.*,[66] which concluded that the term rejection, as used in § 365(g), should be interpreted to mean "termination" in light of the language limiting the claim of a lessor of real estate under 11 U.S.C. § 502(b)(6). Section 502(b)(6) provides for a cap on a claim "if such claim is the claim of a lessor for damages resulting from *termination* of a lease of real property" [italics added]. The court in *Picnic 'N Chicken* held that § 502(b)(6) was merely intended to cap a lessor's claim, and did not define the rights flowing from § 365(g).

The same court, under different facts, held in *In re Blackburn*[67] that a deemed rejection of an automobile lease under which a chapter 13 debtor was the lessee did not terminate the lease. Rather, the rights of the parties vis-a-vis the automobile, notwithstanding the rejection, were governed by state law.

*ADHERENCE TO THE COUNTRYMAN TEST DOES NOT REQUIRE THE COURT TO FIND AN AVOIDING POWER*—Does the fact that the 9th Circuit follows the Countryman test somehow foreclose adoption of the Andrew–Westbrook conclusion that rejection is not an avoiding power? Use of the Countryman test was recently reaffirmed in the *en banc* decision in *Robert L. Helms Construction*. The test says that a contract is executory in the following circumstances:

> ... a contract is executory if "the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." [citation omitted][68]

Andrew is rather critical of the Countryman test, concluding it has caused more problems than it has resolved.[69] Westbrook takes a longer view, saying Countryman did an invaluable service by making some sense out of the chaotic case law regarding executory contracts. He feels that both his and Andrew's works are built on the foundation provided by Countryman, alluding to Sir Isaac Newton's statement: "If I have seen farther than others, it is because I have stood on the shoulders of giants."[70] He concludes, however, it was time to move beyond the Countryman test. The Andrew–Westbrook analysis is just such a step forward, building on Countryman's initial work.

But, nothing in the Countryman test forbids a court, even if it finds a contract to be executory, from finding the contract is not terminated by rejection. The provision in the Countryman test that a contract which is subject to a material breach which would allow nonperformance by the other party is not the same thing as saying that a material breach actually exists. If a breach by a nondebtor does not actually exist which would relieve performance by a

---

**66.** *In re Hawaii Dimensions, Inc.*, 47 B.R. 425 (D.Haw.1985), *aff'g*, 39 B.R. 606 (Bankr. D.Haw.1984).

**67.** *Blackburn v. Security Pacific Credit Corporation (In re Blackburn)*, 88 B.R. 273, 276 (Bankr.S.D.Cal.1988).

**68.** *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v.*

*Southmark Corporation (In re Robert L. Helms Construction & Development Co., Inc.)*, 139 F.3d at 705; *see*, Countryman I (*see*, footnote 4 *supra* ) at 460.

**69.** Andrew I at 849–50.

**70.** Westbrook at 236–39.

debtor, then the Countryman test does not *per se* debar recognition of the nondebtor's property or contract rights.

Even though Countryman might have thought that specific performance should not be granted after rejection of an executory contract,[71] the 9th Circuit did not adopt the totality of his two extensive law review articles,[72] but only his forty-word test, which says nothing about the effect of rejection.

*CASES HOLDING THAT REJECTION IS "TERMINATION" ARE NOT DISPOSITIVE*—Several 9th Circuit opinions have held that a deemed rejection of an executory contract amounts to a "termination" of the contract vis-a-vis the debtor's rights, but they are not fatal to the Andrew–Westbrook approach.

*Sea Harvest Corp.*[73] and *Elm Inn, Inc.*[74] state that rejection of an executory contract by a debtor-*lessee* results in termination of the debtor's operation or the debtor's possessory interest. Both of these cases involved debtor-lessees whose rights under a lease were deemed to have been terminated under § 365(d)(4). These cases involved a different question entirely than one in which the debtor was the lessor or the grantor of rights to the nondebtor in estate property.[75]

Although the language of these cases might be viewed as an inference that "rejection" is "termination," they did not consider how rejection would effect the rights of parties other than ones situated like the debtor-lessees in those cases. Neither of these cases is binding precedent regarding the Wood River, Ltd. RFR in question. The issues are not the same and therefore not controlling.[76]

Likewise, several lower courts in the 9th Circuit have made similar statements, that rejection of an executory contract is akin to termination. Both the bankruptcy court (holding that the lease was terminated, not abandoned to the debtor) and the 9th Circuit BAP ("To us, 'rejection' normally implies termination of the debtor's interest"), in *In re Southwest Aircraft Services, Inc.*,[77] held that the deemed rejection of aircraft leases, in which the debtor was lessee, terminated the leases. While this may have been a somewhat accurate description of the debtor-in-possession's rights under the lease, it is not authority for situations where a nondebtor's property or contract rights in property of the estate are at issue.

The bankruptcy court and district court in Hawaii reached conclusions similar to the bankruptcy and district court in the *Southwest Aircraft Services* case, in *In re Hawaii Dimensions, Inc.*,[78] which held that a rejected lease of a debtor-lessee terminated the lease.

*CASES IMPLYING THAT REJECTION OF A CONTRACT AVOIDS RIGHTS LIKE OPTIONS OR AN RFR ARE NOT DISPOSITIVE* The implication of the BAP in *Coordinated Financial Planning*,[79] and the 9th Circuit in *Robert*

71. Westbrook at 255–56; Countryman I (*see*, footnote 4 *supra* ) at 465–466.

72. Countryman I (*see*, footnote 4 *supra* ); Vern Countryman, *Executory Contracts in Bankruptcy (Part 2)*, 58 Minn. L. Rev. 479 (1974).

73. *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077 (9th Cir.1989).

74. *Anderson v. Elm Inn, Inc. (In re Elm Inn, Inc.)*, 942 F.2d 630 (9th Cir.1991).

75. *CASC Corp. v. Milner (In re Locke)*, 180 B.R. 245, 252–54 (Bankr.C.D.Cal.1995).

76. 23 Am.Jur.2d, § 155.

77. *In re Southwest Aircraft Services, Inc.*, 53 B.R. 805, 810 (Bankr.C.D.Cal.1985), *aff'd.* 66 B.R. 121, 123 (9th Cir. BAP 1986), *rev. on other grounds*, 831 F.2d 848 (9th Cir.1987).

78. *In re Hawaii Dimensions, Inc.*, 39 B.R. 606, 608 (Bankr.D.Haw.1984), *aff'd*, 47 B.R. 425, 427–28 (D.Haw.1985).

79. *Steffan v. McMillan (In re Coordinated Financial Planning Corp.)*, 65 B.R. 711, 713 (9th Cir. BAP 1986).

*L. Helms Construction*[80] is that, if an executory contract is rejected, the RFR or option, as the case may be, will be avoided, terminated, or unenforceable. But, since these cases did not explicitly hold that this was the conclusion mandated, they are not authority which would prohibit me from finding that the RFR held by Wood River, Ltd. is not avoidable by rejection.

These cases did not address the effect of rejection. They are not binding:

> For a case to be stare decisis on a particular point of law, that issue must have been raised in the action decided by the court, and its decision made part of the opinion of the case; accordingly, a case is not binding precedent on a point of law where the holding is only implicit or assumed in the decision but is not announced.[81] [footnotes omitted]

*CASES HOLDING THAT REJECTION AVOIDS AN OPTION OR CONTRACT TO SELL*—A few cases from Hawaii have come to conclusions contrary to the Andrew–Westbrook approach. They hold that a rejection of an executory contract or lease terminates it, and any rights a nondebtor might have had under state law in the property involved.

In *In re Gillis*,[82] a bank had a prepetition assignment of rents of the debtor, who was lessee of property which he sublet to subtenants. Due to defaults, the bank had been collecting rents from these subtenants for many months.

The debtor filed chapter 13 bankruptcy, later converted to chapter 7, but neither he nor the trustee assumed the lease with-

in the 60–days allowed by § 365(d)(4), so it was deemed rejected.

The trustee sought to recover the rent collected post-petition. The court granted that relief. It held that the deemed rejection terminated the lease, relating back to the date of the petition, so there was nothing for the bank's assignment to attach to.

Thus, the court held that the rent which the bank collected as of the petition date was property of the estate, relying on the BAP opinion in *Southwest Aircraft Services* previously discussed in this Part 4.2.3. The court completely disregarded the bank's rights in the collateral.

The same bankruptcy court and the district court concluded that rejection of a lease is a termination in the *Hawaii Dimensions* case discussed above.[83]

*IN RE KAONOHI OHANA, LTD. APPEARS TO BE DICTA*—My research uprooted a case which contains a statement seemingly contrary to the Andrew–Westbrook analysis. If it is precedent, then I am bound not to apply the Andrew–Westbrook approach. I conclude, however, that the statement is *dicta*.

*Kaonohi Ohana, Ltd.*,[84] involved a rejected executory contract for the sale of land in which the debtor was the seller and the nondebtor party the purchaser. The facts are convoluted and the 9th Circuit was deciding three separate appeals.

Kaonohi Ohana sold some property to Sutherland. Then, it had a better offer from Sylvester Stallone, and reneged on the first offer on the grounds the corporate authorization for it was defective. The issue regarding the corporation's au-

**80.** *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v. Southmark Corporation (In re Robert L. Helms Construction & Development Co., Inc.)*, 139 F.3d 702 (9th Cir.1998).

**81.** 23 Am.Jur.2d, § 153.

**82.** *In re Gillis*, 92 B.R. 461 (Bankr.D.Haw. 1988).

**83.** *In re Hawaii Dimensions, Inc.*, 39 B.R. 606 (Bankr.D.Haw.1984), *aff'd*, 47 B.R. 425 (D.Haw.1985).

**84.** *Kaonohi Ohana, Ltd. v. Sutherland (In re Kaonohi Ohana, Ltd.)*, 873 F.2d 1302 (9th Cir.1989).

thority to enter into the Sutherland contract went up to the 9th Circuit in a prior case [85] which held that the corporation did have authority. The case was remanded to the district court which had various motions pending.

Then, Kaonohi Ohana filed chapter 11. The stay was lifted to allow the district court to proceed. Before the district court took action, the debtor moved to reject the Sutherland contract. The bankruptcy court approved the rejection and allowed the debtor to refuse to perform, leaving Sutherland to claim damages against the debtor. The district court affirmed (one of the matters on appeals).

Later, the district court ruled against the debtor on the pre-bankruptcy declaratory judgment action (a second matter on appeal).

Sutherland then filed an adversary proceeding in the bankruptcy case demanding specific performance of either the Sutherland contract or the Stallone contract. This was apparently heard by the district court, which dismissed the debtor because the property had already been conveyed and the relief requested could not be granted, and dismissed Stallone because the district court did not think it had subject jurisdiction to decide the dispute between two nondebtors (the final point on appeal, and the one that concerns us).

Thus, the three appeals concerned: (a) debtor's appeal of the ruling against the debtor on the pre-bankruptcy declaratory judgment action (which is not relevant to this *Memorandum*); (b) Sutherland's appeal of the ruling that the contract with the debtor was executory and could be rejected (also, not directly relevant to the issue in Part 4.2 of this *Memorandum*); and (c) Sutherland's appeal of the dismiss-al of the specific performance adversary proceeding against both the debtor and Stallone (the ruling on the dismissal of the debtor *is*, finally, the point of this windy exposition on this case).

The appellate court gave short, but complete explanations for the rulings on each of the issues appealed, except the one that concerns us, the dismissal of the adversary proceeding by Sutherland against debtor to enforce her rights as a purchaser of the real property. Sutherland's adversary proceeding against the debtor had been dismissed by the district court because the debtor had already conveyed the property and specific performance by the debtor could not be granted.

The appellate court upheld the dismissal of the debtor from the specific performance action, but only addressed the matter in a terse footnote. It made no mention of the fact that the district court had dismissed the specific performance action on the grounds no relief was possible because the property had previously been conveyed by the debtor. It did not say that the district court's reasoning was right or wrong.

The court's disposition of this point on appeal was so perfunctory that Westlaw did not even pick it up as a headnote. The footnote merely said that Sutherland's appeal of the dismissal of the adversary proceeding against the debtor was without merit, and that "specific performance of a rejected executory contract cannot be required." [86]

In support of this cursory statement, the court cited as authority a footnote from another 9th Circuit case, *In re Pacific Express*.[87] That footnote was just a generalized comment on how § 365(a) basically functioned, which said:

**85.** *Sutherland v. Kaonohi Ohana, Ltd.,* 776 F.2d 1425 (9th Cir.1985), *cert. den.,* 475 U.S. 1109, 106 S.Ct. 1517, 89 L.Ed.2d 916 (1986).

**86.** *Id.* at 1306, fn. 5.

**87.** *Pacific Express, Inc. v. Teknekron Info-switch Corp. (In re Pacific Express, Inc.),* 780 F.2d 1482, 1486, fn. 3 (9th Cir.1986).

Generally, the bankruptcy court may order the bankrupt's estate either to assume or reject any executory contract or unexpired lease, subject to its approval. 11 U.S.C. § 365(d)(2). Assumption assures the continuation in force of the contract or lease. However, it requires the trustee or debtor-in-possession to cure all past defaults and to offer adequate assurance of future performance. Rejection allows the bankrupt's estate to avoid those requirements and limits the non-bankrupt obligee to an unsecured claim for breach of contract. After rejection, the performance of the non-bankrupt obligee is excused.

Neither the footnote nor the rest of *Pacific Express* even discuss "specific performance" and, in fact, it was a case where the debtor was in the position of a lessee, not a lessor. In context, it was as if the Kaonohi Ohana had been the vendee, instead of the vendor of the real estate contract. The rights of the lessor and lessee are completely different.

So, I must determine if the statement in *Kaonohi Ohana* that specific performance of a rejected executory contract cannot be required is binding on me in the case at bar. In *Kaonohi Ohana*, the Sutherland adversary proceeding for specific performance against the debtor had been dismissed on completely different grounds— not because specific performance was *impermissible*, but because it was *unavailable* under the facts.

It is probable that the statement in the *Kaonohi Ohana* footnote was *dicta*. Given the structure of the opinion and the fact that the court had just held that Sutherland's appeal of the bankruptcy court rul-

ing that the contract was rejected was moot because she had not sought a stay, the statement about specific performance appears to be mere commentary on the law which was not necessary to its holding.

I believe the court, like the courts in the *Sea Harvest Corp.*[88] and *Elm Inn, Inc.*[89] cases discussed above, merely assumed, without deciding, that the rejection of the contract was a termination of the contract, so that there was nothing for the debtor to specifically perform.

Therefore, I will treat the statement about specific performance as *dicta* because it appears to be an additional reason for upholding the dismissal, but unnecessary to the ruling.[90]

*CONCLUSION THAT NO BINDING 9TH CIRCUIT AUTHORITY BARS USE OF THE ANDREW–WESTBROOK APPROACH*—Nothing in the 9th Circuit case law forbids the conclusion I have reached. It is the result which most of the scholars would reach also, as showing in Part 4.2.4.

*4.2.4. Secondary Authority Generally Adopts the Andrew–Westbrook Approach*—Collier on Bankruptcy now agrees with Andrew's and Westbrook's analysis:[91]

> Unlike other provisions of section 365, 10 which mention the "termination" of a contract or lease, section 365(g) describes the effect of rejection as a "breach" of the contract or lease. Indeed, section 365 uses the terms "rejection," "breach" and "termination" differently. 11 Thus, "rejection" is the decision of the trustee or the debtor, as the case may be, not to assume a burdensome contract or lease. "Rejection" constitutes a "breach" pursuant to section 365(g), except to the extent that a

88. *Sea Harvest Corp. v. Riviera Land Co.,* 868 F.2d 1077 (9th Cir.1989).

89. *Anderson v. Elm Inn, Inc. (In re Elm Inn, Inc.),* 942 F.2d 630 (9th Cir.1991).

90. *In re Kuraishi,* 237 B.R. 172, 175 (Bankr. C.D.Cal.1999); *King v. Erickson,* 89 F.3d

1575, 1582 (Fed.Cir.1996), *rev. on other grounds,* 522 U.S. 262, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998); *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1184 (10th Cir.1995).

91. 3 *Collier on Bankruptcy,* ¶ 365.09 (15th ed. rev. 1999).

contract or lease is "terminated" pursuant to section 365(h) or (i). Subsections (h) and (i) authorize lessees of real property, timeshare purchasers or buyers of real property to remain in possession of the property after rejection by a lessor or seller or, alternatively, to treat the lease or sale agreement as "terminated" by the rejection. Other than the option given to lessees and purchasers to treat rejection as termination, section 365 does not explicitly provide for termination of a party's or lessee's contract interests. Moreover, if rejection of the lease worked a termination, it would be difficult to justify granting the other party to the contract or lease a damage claim for rejection, which the lessor is given by section 502(g).

This suggests that the effect of rejection of an executory contract or unexpired lease is limited to a breach or abandonment by the debtor or trustee rather than a complete termination of the lease. [footnotes omitted, one citing Andrew I]

Other respected academics adopt the same analysis, e.g., in the recent bankruptcy textbook of David Epstein, Steve Nickles and James White: [92]

### e. *Rejection as an Avoiding Power*.

The question of whether section 365 rejection operates as a kind of avoiding power to bring back into the estate assets transferred by the debtor prior to its bankruptcy filing is now moot in license cases like *Lubrizol:* section 365(n) now protects licensees of intellectual property. The question remains important, however, in other section 365 situations, such as leases of personal property and franchise contracts.

In *real property* leases, the bankruptcy laws have long expressly recognized that rejection is not an avoiding power.

Section 70b provided that rejection by a debtor/lessor "does not deprive the lessee of his estate." There is similar language in section 365(h). Accordingly, rejection of a real property lease by a debtor/lessor does not terminate the lessee's rights under the lease to the leasehold. Courts, however, have looked to this language dealing with the effect of rejection in *real* property lease situations to conclude that rejection does work as an avoiding power in other situations. We do not believe that rejection should work as a kind of avoiding power to bring back into the estate assets transferred by the debtor under the contract.

Assume for example that D leases equipment. D files for bankruptcy while the lease is still in effect and is in possession of the equipment pursuant to the lease. At the time of the bankruptcy filing, D's property of the estate includes D's nonpossessory, reversionary "interest" in the equipment, not the equipment. Unless rejection under section 365 somehow operates as an avoiding power, the trustee takes the debtor's limited interest in the equipment. X should be able to continue to retain and use the leased equipment for the remainder of the lease term.

Section 365 rejection is not an avoiding power that somehow clears title to the underlying property covered by the lease or contract. Section 365 rejection does not make the other party's interest in the property disappear. Section 365 rejection does not even make the rejected lease or contract disappear. [footnotes omitted]

The recent National Bankruptcy Review Commission, in suggesting revisions to the bankruptcy code, concluded that the rejection of an executory contract was, as Andrew and Westbrook argued, not an avoiding power and that the statute should be

---

**92.** 1 Epstein, Nickles & White, *Bankruptcy,* § 5.7e, page 455–56 (West 1992).

amended to make that more directly apparent. The commission recommended that the Bankruptcy Code be specifically amended so that "Section 365 should provide that a trustee's ability to elect to breach a contract of the debtor is not an avoiding power." The NBRC stated its reasons as follows: [93]

Section 365 permits a debtor in possession or trustee to elect to "reject" a contract entered prepetition, subject to court approval. The term "rejection" has no obvious state contract law counterpart. Although the Bankruptcy Code provides that rejection should be treated as a breach, the Code does not state expressly that rejection is synonymous with breach, nor does it fully delineate the consequences of a trustee's decision to reject. Not surprisingly, the concept of rejection has been applied inconsistently by the courts, and has led to the numerous special interest amendments to section 365.

The Commission recommends a common-sense clarification of the term "rejection" by replacing it with "election to breach." The Commission further recommends that the Bankruptcy Code delineate the consequences of electing to breach to correct on a generic basis the contrary results reached by some courts. The bankruptcy trustee's election not to perform a contract is nothing more or less than a breach of the contract and should be treated accordingly. Rejection does not "nullify," "rescind," or "vaporize" the contract or terminate the rights of the parties; it does not serve as an avoiding power separate and apart from the express avoiding powers already provided in the Bankruptcy Code. For example, if a debtor entered a contract prepetition and conferred rights in an asset to a nondebtor party, a trustee would not be entitled to repudiate the transfer and retrieve the property unless one of the other avoiding powers not section 365 permitted it to do so. Under most circumstances, this means that the nondebtor party would be entitled to a claim for money damages, and the contract obligations themselves would be discharged. The claim would be paid in the bankruptcy pro rata with other unsecured creditors.

With a few important exceptions, bankruptcy law accepts the nonbankruptcy substantive law applicable to a contract, but bankruptcy adjusts the form of the remedies available upon breach. Damages may be calculated under state law, but they are paid out according to bankruptcy priorities and principles. Specific performance may be available under state law, but it is rarely permitted against the trustee. Thus, state contract law generally defines a party's rights, while federal bankruptcy law determines how those rights are enforced in a bankruptcy case. The most important example, which is the choice between damages and specific performance, has powerful distributional consequences and must be governed by a uniform policy in a bankruptcy case; otherwise, state laws providing very broad rights to specific performance would have the inequitable effect of granting preferential treatment to certain contract creditors, to the detriment of all other general unsecured creditors in bankruptcy.

The recommended clarifications should prevent the contrary results reached by some courts without requiring enactment of additional special interest legislation in response to each individual case. It would make it clear that the impact of electing to breach under section 365 is limited to the consequences of breach under state law, sub-

---

**93.** From the *National Bankruptcy Review Commission Final Report,* October 20, 1997, 2.4.1, *Clarifying the Meaning of "Rejection",* which can be found in Appendix G, App. Pt. 44, *Bankruptcy—The Next Twenty Years* (15th ed. rev. 1999).

ject to the limitations on remedies imposed by the Code.

*Competing Considerations.* Some would argue that a trustee or debtor in possession should be able to avoid or rescind a contract in bankruptcy whenever it would be helpful to a reorganization to do so. For example, if the debtor is a lessor of copy machines, avoidance of all leases might permit the debtor in possession to sell the machines in bulk, rather than selling only lease residuals. However, this would enable the debtor in bankruptcy to make contracts disappear a power that is very different from a simple breach of contract for which the debtor would incur damages. If a debtor were empowered to demand possession of property from a third party, the bankruptcy process would readjust the bargains struck at state law, rather than simply determine a claim for breach. To permit the trustee or debtor in possession to undo valid contracts whenever the estate might benefit would introduce a great deal of uncertainty into private bargaining and might lead to abuse.

There is some concern that adjusting the lexicon of section 365 could encourage additional litigation. However, using the word "breach" incorporates a term from state law contract principles with which courts already are familiar. It is likely to diminish rather than increase confusion. Rejection, a concept with no state law contract analogue, has been problematic. The special interest amendments to section 365 reflect an attempt to work around the notion of a breach as a repudiation or avoidance power, consistent with this Proposal. The proposed change is intended to harmonize both the term used and the concept involved in determining what a trustee may do if a contract is not to be performed.

Finally, this Proposal might be criticized as being inadequately remedial since it stops short of dismantling the special interest provisions presently in section 365. Some might take issue with the more conservative approach used by the Commission on the basis that section 365 will remain too complicated even with these changes. More importantly, the proposed changes call into question the interpretation of the complicated, industry-specific provisions that remain in section 365. By negative implication, legislation devoted to only one type of contract undercuts the general applicability of the principles it expresses. Establishing a general rule that is consistent with the principles of the special interest legislation without eliminating the special interest legislation may cause courts to place a more limited interpretation on either the general or the limited rule. It is Congress' prerogative to consider whether this package of amendments vitiates the need for several of the subsections of section 365 that apply only to one type of industry or contract.

At least one law review article [94] is critical of the Andrew–Westbrook conclusion, but it does not compare with the weight and stature of the favorable authority.

5. *CONCLUSION*—The RFR is not an executory contract and therefore not subject to rejection under 11 U.S.C. § 365(a).[95] The conclusion is a *non sequitur*, however, and the more important conclusion is that § 365(a) is not an avoiding power which repudiates, cancels or terminates the RFR.[96]

---

**94.** Laura B. Bartells, *Revisiting Rejection: Secured Party Interests in Leases and Executory Contracts,* 103 Dickinson Law Rev. 497 (Spring 1999).

**95.** *See,* Part 4.1 of this *Memorandum.*

**96.** *See,* Part 4.2 of this *Memorandum.*